AO 91
Rev. 11/97

**CRIMINAL COMPLAINT**

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>IRVING DAVID RUBIN and<br>EARL LESLIE KRUGEL | DOCKET NO. |
| | MAGISTRATE'S CASE NO.<br><br>01-  **01-2606M** |

Complaint for violation of Title 18, United States Code §§ 371, 844(i), and Title 18 United States Code § 924 (c)(1)

FILED
CLERK, U.S. DISTRICT COURT
DEC 1 2 2001
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| NAME OF MAGISTRATE JUDGE<br><br>VICTOR B. KENTON | UNITED STATES<br>MAGISTRATE<br>JUDGE | Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>December 11, 2001 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

LODGED
DEC 12 11 44 AM '01
CLERK U.S. DISTRICT OF CALIF.
CENTRAL DIST. OF CALIF.
LOS ANGELES

**SEE ATTACHMENT**

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>*Mary P. Hogan*<br>MARY P. HOGAN |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT -- FBI |

| Sworn to before me and subscribed in my presence, | |
|---|---|
| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br><br>December 12, 2001 |

ENTERED ON ICMS
DEC 1 7 2001

1) See Federal Rules of Criminal Procedure rules 3 and 54.
GWJ:sdp      REC: DETENTION (both defendants)
GWJ

ATTACHMENT

COUNT ONE

[18 U.S.C §§ 371, 844(i)]

Beginning on an unknown date and ending on or about December 11, 2001, in Los Angeles County, within the Central District of California, defendants IRVING DAVID RUBIN and EARL LESLIE KRUGEL conspired, confederated, and agreed to maliciously damage and destroy, by means of an explosive, a building used in interstate commerce and used in activities affecting interstate commerce, namely, the King Fahd mosque, located at 10980 Washington Boulevard in Culver City, California, and, in furtherance of the conspiracy, one of the conspirators committed an overt act for the purpose of carrying out the conspiracy.

COUNT TWO

[18 U.S.C. § 924(c)(1)]

On or about December 11, 2001, in Los Angeles County, within the Central District of California, defendants IRVING DAVID RUBIN and EARL LESLIE KRUGEL knowingly possessed a destructive device, namely, an explosive bomb, during and in relation to a crime of violence, namely, conspiracy to maliciously damage and destroy, by means of an explosive, a building used in interstate commerce and used in activities affecting interstate commerce, as charged in count one of the complaint.

AFFIDAVIT

I, Mary P. Hogan, being duly sworn, hereby depose and say:

1.   I am a special agent with the Federal Bureau of Investigation ("FBI").  I have been so employed for 11 years.  I am currently assigned to the FBI Los Angeles Field Office.  I work on the Los Angeles Task Force on Terrorism ("LATFOT"), also called the Joint Terrorism Task Force ("JTTF").

2.   I have received formal training from the FBI in the conduct of criminal investigations and, in particular, counterterrorism investigations.  I have conducted numerous investigations pertaining to acts of terrorism and weapons of mass destruction.  In addition, I have participated in many other investigations.

3.   This affidavit is made in support of a complaint charging IRVING DAVID RUBIN and EARL LESLIE KRUGEL with conspiracy to destroy a building by means of an explosive, in violation of Title 18, United States Code, Sections 371 and 844(i), and possession of a destructive device during and in relation to a crime of violence, in violation of Title 18, United States Code, Section 924(c).

4.   Both RUBIN and KRUGEL are avowed members of the Jewish Defense League ("JDL"), a violent, subversive organization. RUBIN is the head of the JDL.

1

5.     On October 18, 2001, I was contacted by a confidential source ("CS") about an unsolved 1985 bombing/homicide purportedly committed by the JDL.  The CS is a member of the JDL who has previously committed criminal acts on behalf of the JDL, including building and placing a destructive device at a mosque at the direction of the JDL.  I interviewed the CS on the above date and he/she told me the following:

a.     The CS was recruited into the JDL as a teenager by RUBIN and KRUGEL.

b.     On October 17, 2001, the CS received a telephone call from KRUGEL (identified by the CS as a leading member of the  JDL).  During the ensuing telephone conversation, KRUGEL invited the CS to a JDL meeting at KRUGEL'S residence at 6447 Wilbur Avenue in Reseda, California, on October 19, 2001, and the CS agreed to attend.

c.     Regarding his/her prior criminal activity with the JDL, the CS was instructed by KRUGEL and RUBIN (identified by the CS as the head of the JDL) to target the aforementioned mosque with the explosive device.  At approximately the same time the CS was instructed by KRUGEL and RUBIN to place the explosive device at the mosque, he/she was also instructed by them to blow up a tattoo parlor located at 8818 Reseda Boulevard in

2

Reseda, California, which was being targeted by the JDL

because, according to KRUGEL and RUBIN, it was owned by

a "Nazi."

d.    JDL members instructed him/her on how to construct a

napalm bomb by using styrofoam, gasoline, and an oxygen

breathing apparatus.

e.    KRUGEL and RUBIN instructed him/her on various

occasions to gather intelligence on Islamic religious

institutions in Los Angeles, Orange County, and San

Diego in order to gather intelligence on potential

targets for attack by the JDL.

f.    KRUGEL instructed him/her to photograph the various

potential targets and provided the CS with a camera and

with film, which was later developed by KRUGEL.

g.    The CS conducted research via the internet, and

provided KRUGEL with directions to the potential

targets and backgrounds of the various targets.

h.    The CS also conducted surveillance of the targets on

behalf of KRUGEL, RUBIN, and the JDL.

6.    On October 19, 2001, at approximately 2:00 p.m., the CS

attended the previously arranged meeting at KRUGEL's residence.

After the meeting, I spoke to the CS and listened to a tape

recording of the meeting.  In so doing, I learned the following:

a.    KRUGEL and RUBIN were both present at the meeting.

3

b.   The purpose of the meeting was to introduce the CS to another purported JDL member so that the two of them could jointly conduct criminal activity on behalf of the JDL.

c.   KRUGEL and RUBIN discussed bombing Arab-related institutions in the Los Angeles area, including the Muslim Public Affairs Council ("MPAC") in Los Angeles.

d.   KRUGEL stated that Arabs needed a wake-up call and that the JDL needed to do something to one of their "filthy" mosques.

e.   In reference to KRUGEL'S statement regarding a wake-up call, RUBIN said that the JDL needed to let people know they were alive in a "militant way."

f.   KRUGEL and RUBIN also discussed various other potential targets, including mosques.  KRUGEL and RUBIN made reference to a bar in Anaheim, California, purportedly owned by Nazis, but it was not clear from the conversation whether they intended to take action against the bar.  In regard to potential targets, RUBIN stated that it was his desire to blow up an entire building, but that the JDL did not have the technology to accomplish such a bombing (apparently alluding to the September 11, 2001, terrorist attacks).

g.    RUBIN also said that the JDL should not go after a

human target because they still had not heard the end

of the Alex Odeh incident (referring to a prior bombing

and murder reputedly committed by the JDL).

h.    RUBIN also referred to MPAC as a viable target for the

JDL's intended bombing.

7.    After the meeting on October 19, 2001, the CS informed me that KRUGEL had in his possession a list of mosques that were potential targets for attack.

8.    On October 29, 2001, the CS attended another JDL meeting at KRUGEL's residence.  Prior to the meeting, I outfitted the CS with a concealed recording device.  After the meeting, I spoke to the CS and reviewed the tape recording of the meeting obtained by the CS.  In so doing, I learned that KRUGEL had directed the CS to take photographs of the offices of MPAC.

9.    On November 4, 2001, the CS attended another JDL meeting at KRUGEL's residence.  Prior to the meeting, I outfitted the CS with a concealed recording device.  After the meeting, I reviewed the tape recording of the meeting obtained by the CS and spoke to the CS.  In so doing, I learned the following:

a.    KRUGEL and the CS drove to a bagel shop on Ventura

Boulevard.

b.    While sitting in the vehicle, KRUGEL viewed

5

numerous photographs (ostensibly taken by the CS) of the Los Angeles office building that houses MPAC, as well as of surrounding areas.

c.     KRUGEL stated that he had three feet of bomb fuse at his residence that could be used to construct a bomb to blow up MPAC.

d.     KRUGEL stated that he and the CS could manufacture the bomb at KRUGEL'S residence.

e.     KRUGEL suggested that the CS place the bomb at MPAC at night.  KRUGEL also stated that they should plant the bomb at night because if they injured anyone it would bring "heat" on the JDL.

f.     KRUGEL instructed the CS to use a shopping bag to conceal the bomb intended for MPAC.

10.   On November 8, 2001, the CS met KRUGEL at Brent's Deli in the San Fernando Valley.  KRUGEL and the CS went to a restaurant next door to Brent's Deli called Stovepipe.  Prior to the meeting, I outfitted the CS with a concealed recording device.  After the meeting, I spoke to the CS and reviewed the tape recording of the meeting obtained by the CS.  In so doing, I learned the following:

a.     KRUGEL discussed with the CS further plans for placing a pipe bomb at the Los Angeles office of MPAC.

6

   b.   KRUGEL instructed the CS to obtain gunpowder to
        construct the bomb and told him/her to obtain the
        powder outside the Los Angeles area.

   c.   KRUGEL told the CS that he (KRUGEL) would show the CS
        how to obtain the right type of pipes to utilize in
        making the bomb.

   d.   KRUGEL stated that he could not obtain the bomb
        components himself because he would be recognized by
        law enforcement.

   11.   On November 14, 2001, the CS attended another JDL
meeting at KRUGEL's residence.   Prior to the meeting, I outfitted
the CS with a concealed recording device.   After the meeting, I
spoke to the CS and reviewed the tape recording of the meeting
obtained by the CS.   In so doing, I learned the following:

   a.   KRUGEL gave the CS a piece of safety fuse.   After the
        meeting the CS turned that fuse over to me.

   b.   KRUGEL showed the CS a box containing, among other
        items, a piece of pipe which contained holes drilled
        into it (which can be used in making a pipe bomb).

   c.   KRUGEL discussed with the CS other bombings he (KRUGEL)
        was involved in or knew about.

   d.   KRUGEL and the CS again discussed plans to place an
        explosive device at the Los Angeles office of MPAC.

7

e.   KRUGEL instructed the CS that the explosive powder to be used to construct a bomb should be of the type used to fire a cannon.

f.   KRUGEL said he still had rubber gloves (apparently in reference to not leaving fingerprint evidence of their activities).

12.   On November 20, 2001, the CS attended another JDL meeting at KRUGEL's residence.  Prior to the meeting, I outfitted the CS with a concealed recording device.  After the meeting, I reviewed the tape recording of the meeting obtained by the CS and spoke to the CS.  In so doing, I learned the following:

a.   KRUGEL discussed further plans to place a bomb at the Los Angeles office of MPAC.

b.   KRUGEL discussed another JDL bombing he (KRUGEL) was involved in many years ago.

c.   KRUGEL told the CS something to the effect that the CS should use a bag to keep everything clean so as not to leave fingerprints.

d.   KRUGEL discussed with the CS when to purchase the pipes and gunpowder to be used to construct the bomb.

e.   During the meeting RUBIN called and told KRUGEL to say hello to the CS for him (RUBIN).

8

f.    The CS asked KRUGEL why RUBIN was not present at the
meeting and KRUGEL stated that it was not necessary for
RUBIN to be present.

13.   On November 29, 2001, the CS attended another JDL
meeting at KRUGEL's residence.  Prior to the meeting, I outfitted
the CS with a concealed recording device.  After the meeting, I
spoke to the CS and reviewed the tape recording of the meeting
obtained by the CS.  In so doing, I learned the following:

a.    KRUGEL discussed further detailed plans to place a bomb
at the Los Angeles office of MPAC.

b.    The CS asked KRUGEL about the possibility of an Arab
getting killed should a bomb explode at the office of
MPAC.   KRUGEL replied, "C'est la vie," indicating that
he did not care if an Arab died in the explosion.

c.    KRUGEL suggested that they "shop" the next week for the
components to build the bomb.

14.   On December 5, 2001, I spoke to the CS and he/she
provided me with a phone number for the "JDL Hotline."  The
number the CS provided was (818) 980-8535.  I called the phone
number provided by the CS that day and heard a recording of a
voice I know to be that of RUBIN.  In the recording, RUBIN, in an
agitated voice, expressed the need to "hunt down" Palestinians.

15.   On December 7, 2001, the CS attended another JDL

9

meeting at KRUGEL's residence.  Prior to the meeting, I outfitted the CS with a concealed recording device.  After the meeting, I reviewed the tape recording of the meeting obtained by the CS and spoke to the CS.  In so doing, I learned the following:

    a.    RUBIN was not present at this meeting.

    b.    KRUGEL called RUBIN from the meeting and instructed him to contact the CS on his/her (the CS's) cellular telephone.

    c.    KRUGEL and the CS discussed shopping together for bomb components, and KRUGEL advised the CS that he/she should not shop for components without KRUGEL because it was important to get the right components.

    d.    KRUGEL and the CS also discussed a schedule for their planned bombing.

    e.    KRUGEL told the CS that all of their planning was contingent upon the CS talking to RUBIN.

    f.    KRUGEL told the CS that RUBIN would pay for the bomb components that they (KRUGEL and the CS) intended to purchase.

16.  On December 8, 2001, the CS met RUBIN outside a Starbucks coffee shop in the San Fernando Valley.  Prior to the meeting, I outfitted the CS with a concealed recording device. After the meeting, I reviewed the tape recording of the meeting

10

obtained by the CS and spoke to the CS.  In so doing, I learned the following:

    a.    The CS told Rubin that he/she had purchased explosive powder to be used to make a bomb.

    b.    Rubin asked the CS whether the store took the CS's name when he/she bought the powder, and the CS said that the store did not take his/her name.

    c.    Rubin asked if the CS bought Unique brand smokeless powder, and the CS said that he/she did.

    d.    The CS provided RUBIN with photographs that he/she had ostensibly taken of MPAC, and RUBIN reviewed those photographs.

    e.    RUBIN said that he wanted to change the bombing target from MPAC to a mosque.

    f.    RUBIN and the CS agreed to meet again to formalize their plans.

17.  On December 10, 2001, the CS attended another JDL meeting at KRUGEL's residence.  Prior to the meeting, I outfitted the CS with a concealed recording device.  After the meeting, I reviewed the tape recording of the meeting obtained by the CS and spoke to the CS.  In doing so, I learned the following:

    a.    KRUGEL and the CS traveled from KRUGEL's residence to a Home Depot store in Woodland Hills, California.

b.   KRUGEL and the CS entered the Home Depot together and KRUGEL pointed out pipes for the CS to purchase to build the planned bomb.

c.   KRUGEL told the CS not to purchase end-caps at the same time he/she purchased the pipes because making the purchases at the same time would arouse suspicion.

d.   KRUGEL left the store and the CS then purchased the pipes that KRUGEL had selected.

e.   KRUGEL and the CS returned to KRUGEL's residence and unloaded the pipes in KRUGEL's garage.

f.   KRUGEL told the CS that he/she, RUBIN, and KRUGEL would all meet on Tuesday (December 11, 2001) to finalize plans for the bombing.

g.   The CS again brought up the possibility that someone would be killed or injured at their intended bombing target, and KRUGEL told the CS that they did not want to hurt anyone because that would bring too much pressure on the JDL.  KRUGEL also stated, however, that he did not believe anyone would be present at the target site.

18.   On December 11, 2001, the CS had a series of telephone calls with KRUGEL and attended a meeting with RUBIN and KRUGEL. Prior to the meeting, I outfitted the CS with a concealed recording device and with a transmitting device.  In addition, I

12

consensually monitored some of the phone calls between KRUGEL and
the CS.  During the CS's contacts with RUBIN and KRUGEL, I
monitored the CS's conversations as they were transmitted to me
by the device the CS was wearing.  Following the meeting I spoke
to the CS.  I have not yet had the opportunity to review the tape
recordings of the CS's conversations with KRUGEL and RUBIN on
December 11, 2001, and the information set forth below is based
upon my recollection of those conversations.  From monitoring the
CS's conversations and from speaking to the CS, I learned the
following:

  a.   The CS spoke to KRUGEL on the telephone and KRUGEL
       asked the CS to pick him (KRUGEL) up at his residence
       so that he, the CS, and RUBIN could meet at Jerry's
       Famous Deli in Encino, California.

  b.   A short time later, KRUGEL again called the CS and
       asked the CS to meet him (KRUGEL) at Jerry's Famous
       Deli rather than picking him up.

  c.   The CS, RUBIN, and KRUGEL met at Jerry's Delicatessen.
       During the meeting, RUBIN or KRUGEL stated that they
       would leave the completed bomb at KRUGEL's residence,
       and that they would make further plans about the
       bombing today (December 12, 2001).

  d.   During the meeting, RUBIN left the restaurant, went to
       his car, and retrieved some papers from the car.  RUBIN

13

showed the papers to KRUGEL and the CS, and the papers
turned out to be a list of potential bombing targets.
It was from this list that the CS was given the address
of the targeted mosque.

e.    During the meeting, RUBIN specifically identified two
targets that were to be bombed.  Those targets were:
(1) King Fahd mosque located at 10980 Washington
Boulevard in Culver City, California, and (2) the
office of United States Congressman Darrell Issa.

f.    Following the meeting at Jerry's Famous Deli, KRUGEL
and the CS both drove to KRUGEL'S residence.  At
KRUGEL'S residence, KRUGEL and the CS unloaded
explosive powder from the CS's car into KRUGEL'S
garage.

19.  After the powder was loaded into KRUGEL'S garage, FBI
special agents and local police officers served a search warrant
on KRUGEL'S home and garage.  Inside the home and garage, agents
and officers found the explosive powder that the CS had provided
to KRUGEL, fuses for use in bomb-making, pipes, and end caps.
Agents and officers also found 12 firearms in KRUGEL's residence.
Those weapons included: (1) five hand-guns, (2) one shotgun, and
(3) six rifles.  Some of these firearms were loaded.

21.  On December 12, 2001, I spoke to Special Agent David
Baker, who is an FBI Special Agent and bomb technician.  Special

14

Agent Baker informed me that the materials found in KRUGEL'S home could easily be assembled to make an explosive device.

22.   Based on the foregoing, I submit that there is probable cause to believe that EARL LESLIE KRUGEL and IRVING DAVID RUBIN are guilty of conspiracy to destroy a building by means of an explosive device, in violation of Title 18 United States Code, Sections 371 and 844(i), and of possession of a destructive device during and in relation to a crime of violence, in violation of Title 18, United States Code, Section 924(c).

Mary P. Hogan
Special Agent, FBI

Sworn and subscribed to before me
on this 12th day of December, 2001

VICTOR KENTON
UNITED STATES MAGISTRATE JUDGE

15